UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| CALDWELL WHOLESALE COMPANY, L.L.C. | CASE NO. 5:17-cv-200 |
| V. | JURY DEMAND |
| R. J. REYNOLDS TOBACCO COMPANY | |

## COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Plaintiff, Caldwell Wholesale Company, L.L.C. ("Caldwell"), who files this Original Complaint showing as follows:

### PARTIES

1. Caldwell is a Louisiana limited liability company domiciled in Caddo Parish.

2. Made Defendant herein is R. J. Reynolds Tobacco Company ("RJR"), a corporation domiciled in the State of North Carolina. RJR is a wholly owned subsidiary of Reynolds American, Inc.

### JURISDICTION AND VENUE

3. The Court has jurisdiction over the claims asserted herein because of the diversity of citizenship of the parties as set forth above.

4. Venue is proper as Caldwell is a domiciliary of this District and RJR does business in this District.

### FACTUAL ALLEGATIONS

5. Caldwell is a full-service wholesale distributor servicing retail customers in the States of Louisiana, Texas, and Arkansas that has been in business since 1953.

6. Caldwell purchased cigarettes and other tobacco products directly from RJR, for resale to Caldwell's retail customers, from 1959 until December 2004.

7. In January 2003, Smith Wholesale Company, Inc., a Tennessee wholesale distributor, filed suit against RJR in the United States District Court for the Eastern District of Tennessee seeking injunctive relief and asserting violations of antitrust law based on RJR's allegedly discriminatory pricing policies (the "Smith Litigation").

8. In November 2003, Caldwell joined the Smith Litigation as one of twenty wholesaler plaintiffs asserting price discrimination and other antitrust claims against RJR.

9. Just prior to commencement of the Smith Litigation, during the calendar year 2002, Caldwell's President, Ken Caldwell, had served as President of the American Wholesale Marketers Association ("AWMA").

10. On information and belief, RJR terminated Caldwell's status as a direct purchaser in December 2004 in retaliation for Caldwell's participation in the Smith Litigation. That is, RJR refused, from that point forward, to sell its products directly to Caldwell, requiring Caldwell to instead purchase RJR products from an intermediary to resell them to Caldwell's retailer-customers, who must stock RJR products to satisfy consumer demand.

11. On information and belief, RJR's decision to terminate Caldwell was also based on the misperception that, as President of the AWMA, Ken Caldwell had played a role in organizing the Smith Litigation and encouraging the participation of other wholesalers in same.

12. In reality, Ken Caldwell's tenure as President of the AWMA concluded before the Smith Litigation was instituted, by other wholesalers, and more than a year before Caldwell joined the suit. Caldwell did not participate in organizing the Smith Litigation.

13. Like other tobacco manufacturers, RJR offers reimbursement payments known as "buydowns" to retailers selling RJR products.

14. All "reporting" wholesalers, including Caldwell, report all of their sales of tobacco products to Management Science Associates, Inc. ("MSA").

15. The sales data of wholesalers who are "on direct" with RJR is reported by MSA to RJR. Based on that sales information, RJR then issues buydown reimbursement payments to retailers that have purchased RJR products.

16. The eligibility of a wholesaler's invoices to retailers for these buydown payments is critical to a wholesaler's ability to price its products at a competitive level in the market, as the amount of the buydown typically exceeds the profit margin that a wholesaler makes on the sale of tobacco products on a per unit basis.

17. When RJR terminated Caldwell's direct status in December 2004, it also stopped honoring Caldwell invoices for buydown purposes. Stated differently, since December 2004 RJR has refused to pay buydowns to retailers for any RJR products purchased from Caldwell.

18. A wholesale distributor does not have to be on direct-buying status with RJR to have its invoices honored for buydown purposes. Although RJR refuses to reimburse anyone for products purchased from Caldwell, RJR issues buydown reimbursements for RJR products sold by many other wholesalers who, like Caldwell, are not on direct-buying status and therefore must acquire the RJR products they sell to retailers from other sources.

19. In May 2006, RJR's parent company, Reynolds American, Inc., acquired Conwood, the maker of Grizzly brand moist snuff.

20. At that time, Grizzly was Caldwell's best-selling brand of moist snuff.

21. As a result of the Conwood acquisition, purchases of Grizzly moist snuff, and all other Conwood products, from Caldwell were no longer eligible for buydowns as of May 2006.

22. In February 2011, Caldwell approached RJR to ask whether RJR would consider again honoring Caldwell invoices for buydown purposes, since the loss of business resulting from RJR's refusal to honor Caldwell's invoices for buydowns was beginning to threaten the viability of Caldwell's business.

23. Caldwell did not ask RJR to restore its direct purchasing status. Caldwell's request was only that RJR accept Caldwell invoices for purposes of buydown payments to retailers, as RJR does with respect to other, similarly-situated non-direct wholesalers.

24. Caldwell representatives met with RJR representative, Stan Rogers, to discuss Caldwell's request.

25. After that meeting, in conjunction with RJR's evaluation of the request, Caldwell provided customer sales information requested by RJR.

26. Caldwell also authorized MSA to release Caldwell's proprietary sales information to RJR.

27. RJR subsequently denied Caldwell's request to honor Caldwell invoices for buydown purposes by letter dated June 7, 2011. The only stated reason for RJR's decision was that "distribution of R. J. Reynolds tobacco products would not be improved by putting [Caldwell] on the Data Reporting Program."

28. Approximately three and a half years later, Caldwell made another, essentially identical request, again asking RJR to consider honoring Caldwell invoices for buydown purposes, as it had done for forty-five years until 2004.

29. On June 18, 2014, Caldwell representatives met with RJR representative, Kecalf Bailey, to discuss this second request.

30. After the meeting, Caldwell again provided RJR with customer sales information requested by RJR and authorized MSA to release Caldwell's sales information to RJR.

31. RJR subsequently denied Caldwell's second request to buydown RJR products sold by Caldwell by letter dated October 3, 2014. That letter was substantively identical to the 2011 denial letter, stating only that "distribution of R. J. Reynolds tobacco products would not be improved by putting [Caldwell] on the Data Reporting Program." At that time, nothing was different about Caldwell's ability to distribute RJR products with benefit of the buydown as compared to the forty-five years in which RJR did honor Caldwell's invoices for buydowns.

32. Part of the impetus for Caldwell's second request to RJR was the pending acquisition of Lorillard, Inc. by RJR's parent company, Reynolds American, Inc.

33. Reynolds American, Inc.'s acquisition of Lorillard, Inc. was completed in June 2015.

34. Lorillard, Inc. was the manufacturer of Newport brand cigarettes. Newport is Caldwell's second best-selling brand of cigarettes, accounting for approximately fifteen percent (15%) of Caldwell's cigarette sales as of June 2015.

35. As a result of the Lorillard acquisition, Newport cigarettes, and all other Lorillard products, purchased from Caldwell were no longer eligible for buydowns as of June 2015.

36. RJR's continued refusal to buydown any of its products that have been purchased by a retailer from Caldwell has substantially harmed Caldwell's business. The addition of Lorillard products to the ban on honoring Caldwell's invoices has greatly magnified the adverse impact of that ban on Caldwell's continued viability.

37. For the sake of efficiency and convenience, retailer-customers prefer to purchase the products they sell to consumers from a single wholesaler or as few wholesalers as possible.

38. RJR's refusal to buydown products sold by Caldwell forces many Caldwell customers to obtain RJR products from another wholesaler since they cannot feasibly forego buydowns at the expense of their profit margins.

39. By forcing Caldwell customers to use multiple wholesalers or suffer diminished profit margins, RJR has raised a substantial impediment to Caldwell's ability to retain customers.

40. As a result of RJR's conduct, Caldwell has lost the entire business of certain customers who have switched to another full-service wholesaler for all of their purchases.

41. But for the conduct of RJR, these customers would have remained with Caldwell.

42. As a result of RJR's conduct, Caldwell has also lost a portion of the business of certain customers, who now purchase RJR products from other wholesalers.

43. But for the conduct of RJR, these customers would purchase RJR products from Caldwell.

44. RJR's conduct also substantially impedes Caldwell's efforts to acquire new customers.

45. Customers that would have purchased some or all of their products from Caldwell but for the conduct of RJR have taken their business elsewhere to the substantial detriment of Caldwell.

46. These lost sales and business opportunities have continued to occur, on an ongoing basis, since December 2004, when RJR initially took Caldwell off direct and stopped buying down RJR products purchased from Caldwell, to the present, but have reached a point since the Lorillard acquisition that has caused Caldwell to conclude it cannot indefinitely sustain its business as the lost customers and lost business continue to increase.

## COUNT ONE – TORTIOUS INTERFERENCE WITH BUSINESS

47. The above and foregoing allegations are incorporated herein by reference. RJR's conduct constitutes malicious and wanton interference with Caldwell's business, actionable under Louisiana law.

48. The direct, inevitable, and intentional consequence of RJR's conduct is to deter Caldwell's existing customers, as well as potential future customers, from doing business with Caldwell, and eventually lead to Caldwell's business failure.

49. RJR's conduct serves no legitimate business interest of RJR's and, in fact, hinders the distribution of RJR's own products. The conduct's only purpose is to punitively and maliciously harm Caldwell in retribution for Caldwell's participation in the Smith Litigation or other perceived events. Virtually none of the other twenty plaintiffs in the Smith Litigation, except Smith, have had their direct status terminated and their invoices dishonored for buydown purposes by RJR.

50. This conduct has caused, and continues to cause, damage to Caldwell in the form of lost profits and sales, loss of customers, loss of customer goodwill and other injuries to be proven at trial.

## COUNT TWO – VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

51. The above and foregoing allegations are incorporated herein by reference. RJR's conduct violates the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPCPL"), La R.S. 51:1401, *et seq.* RJR's conduct constitutes a pattern of unethical, oppressive, and substantially injurious business practices in violation of the public policy of the State of Louisiana as reflected in the LUTPCPL.

52. RJR's decision to restrict the distribution of its own products does not represent a reasonable or sound business decision but rather is a specific effort to harm Caldwell as retribution for perceived past events.

53. This conduct has caused, and continues to cause, damage to Caldwell in the form of lost profits and sales, loss of customers, loss of customer goodwill and other injuries to be proven at trial.

WHEREFORE, after due proceedings, Caldwell prays for:

1. Permanent Injunctive Relief enjoining RJR from continuing to refuse to issue buydown payments to retailers that have purchased RJR products from Caldwell;

2. Trial by Jury on all issues presented herein;

3. Damages resulting from RJR's conduct;

4. Attorney's fees and costs associated with this action;

5. Pre-judgment interest; and

6. All other relief to which the Court may determine Caldwell is justly entitled.

Respectfully submitted,

/s/Kyle M. Keegan
Kyle M. Keegan (LSB No. 19942)
J. Brian Juban (LSB No. 28106)
KEEGAN, DENICOLA, KIESEL, BAGWELL,
JUBAN & LOWE, LLC
5555 Hilton Avenue, Suite 205
Baton Rouge, Louisiana 70808
Telephone: (225) 364-3600
Facsimile: (225) 364-3608

Attorneys for Plaintiff,
Caldwell Wholesale Company, L.L.C.