UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| CALDWELL WHOLESALE COMPANY, L.L.C. | CIVIL ACTION NO. 17-0200 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| R.J. REYNOLDS TOBACCO COMPANY | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Before this Court is a Motion to Dismiss (Record Document 17) filed by Defendant, R.J. Reynolds Tobacco Company ("RJR"). RJR seeks dismissal of the state law Louisiana Unfair Trade Practices Act ("LUTPA") and tortious interference with business claims lodged against it by Caldwell Wholesale Company, L.L.C. ("Caldwell"). RJR seeks dismissal on the grounds that Caldwell lacks standing to bring a LUTPA claim, both the LUTPA and the tortious interference with business claims are perempted/prescribed, and Caldwell has failed to allege facts that would entitle it to relief as to both claims. Caldwell opposes the Motion to Dismiss, rebutting each of RJR's defenses. See Record Document 21. For the reasons set forth below, the Motion to Dismiss is **GRANTED**.

**I.     BACKGROUND**

Caldwell is a wholesale distributor servicing retail customers in the States of Louisiana, Texas, and Arkansas that has been in business since 1953. See Record Document 5 at ¶ 5, Amended Complaint. Caldwell purchased cigarettes and other tobacco products directly from RJR, for resale to Caldwell's retail customers, from 1959 until December 2004. Id. at ¶ 6. Like other tobacco manufacturers, RJR offers reimbursement payments known as "buydowns" to retailers selling RJR products. Id. at ¶ 13. All "reporting" wholesalers, including Caldwell, report all of their sales of tobacco

products to Management Science Associates, Inc. ("MSA"). Id. at ¶ 14. The sales data of wholesalers who are "on direct" with RJR is reported by MSA to RJR. Based on that sales information, RJR then issues buydown reimbursement payments to retailers that have purchased RJR products. Id. at ¶ 15. The eligibility of a wholesaler's invoices to retailers for these buydown payments is critical to a wholesaler's ability to price its products at a competitive level in the market, as the amount of the buydown typically exceeds the profit margin that a wholesaler makes on the sale of tobacco products on a per unit basis. Id. at ¶16.

In January 2003, Smith Wholesale Company, Inc., a Tennessee wholesale distributor, filed suit against RJR in the United States District Court for the Eastern District of Tennessee seeking injunctive relief and asserting violations of antitrust law based on RJR's allegedly discriminatory pricing policies (the "Smith Litigation"). Id. at ¶ 7. Ten months later, in November 2003, Caldwell joined the Smith Litigation as one of the twenty wholesaler plaintiffs asserting price discrimination and other antitrust claims against RJR. See id. at ¶ 8.

Caldwell alleges that RJR terminated Caldwell's status as a direct purchaser in December 2004 in retaliation for Caldwell's participation in the Smith Litigation. See id. at ¶ 10. To support its theory, Caldwell contends that RJR's decision to terminate Caldwell was based on the misperception that Caldwell's President, Ken Caldwell, played a role in organizing the Smith Litigation and encouraging the participation of other wholesalers. See id. at ¶ 11. This allegation is based on Ken Caldwell serving as President of the American Wholesale Marketers Association ("AWMA"), just prior to the commencement of the Smith Litigation. See id. at ¶ 9. However, Caldwell asserts that Ken Caldwell's

tenure as President of the AWMA concluded before the Smith Litigation was instituted, by other wholesalers, and more than a year before Caldwell joined the suit. See id. at ¶ 12.

Once Caldwell lost its direct purchaser status with RJR, RJR refused to sell its products directly to Caldwell. See id. at ¶ 10. Therefore, Caldwell was forced to purchase RJR products from an intermediary to resell them to Caldwell's retailer-customers, who must stock RJR products to satisfy consumer demand. See id. Furthermore, when RJR terminated Caldwell's direct status in December 2004, it also stopped honoring Caldwell invoices for buydown purposes. See id. at ¶ 17. In other words, since December 2004 RJR has declined to pay buydowns to retailers for any RJR products purchased from Caldwell. See id. However, Caldwell contends that a wholesale distributor does not have to be on direct-buying status with RJR to have its invoices honored for buydown purposes. See id. at ¶ 18. Caldwell alleges that although RJR refuses to reimburse anyone for products purchased from Caldwell, RJR issues buydown reimbursements for RJR products sold by many other wholesalers who, like Caldwell, are not on direct-buying status. See id.

From the time RJR terminated its direct buying contract with Caldwell in 2004 until now, several events have taken place in the tobacco industry that have adversely impacted Caldwell's business. In May 2006, RJR's parent company, Reynolds American, Inc., acquired Conwood, the maker of Grizzly brand moist snuff. Id. at ¶ 19. At that time, Grizzly was Caldwell's best-selling brand of moist snuff. Id. at ¶ 20. As a result of the Conwood acquisition, purchases of Grizzly moist snuff, and all other Conwood products, from Caldwell were no longer eligible for buydowns as of May 2006. Id. at ¶ 21.

In order to remedy this negative impact, in February 2011, Caldwell approached RJR to ask whether RJR would consider again honoring Caldwell invoices for buydown purposes, since the loss of business resulting from RJR's refusal to honor Caldwell's invoices for buydowns was beginning to threaten the viability of Caldwell's business. See id. at 22. Caldwell did not ask RJR to restore its direct purchasing status. Id. at ¶ 23. Caldwell's request was only that RJR accept Caldwell invoices for purposes of buydown payments to retailers, as RJR does with respect to other, similarly-situated non-direct wholesalers. See id. Caldwell representatives met with RJR representative, Stan Rogers ("Rogers"), to discuss Caldwell's request. Id. at ¶ 24. After that meeting, in conjunction with RJR's evaluation of the request, Caldwell provided customer sales information requested by RJR. Id. at ¶ 25. Caldwell also authorized MSA to release Caldwell's proprietary sales information to RJR. Id. at ¶ 26. RJR subsequently denied Caldwell's request to honor Caldwell invoices for buydown purposes by letter dated June 7, 2011. Id. at ¶ 27. The only stated reason for RJR's decision was that "distribution of R. J. Reynolds tobacco products would not be improved by putting [Caldwell] on the Data Reporting Program." Id.

Approximately three and a half years later, Caldwell made another essentially identical request, again asking RJR to consider honoring Caldwell invoices for buydown purposes, as it had done for forty-five years until 2004. Id. at 28. On June 18, 2014, Caldwell representatives met with RJR representatives, Kecalf Bailey ("Bailey"), to discuss this second request. Id. at 29. After the meeting, Caldwell again provided RJR with customer sales information requested by RJR and authorized MSA to release Caldwell's sales information to RJR. Id. at ¶ 30. RJR subsequently denied Caldwell's

second request to buydown RJR products sold by Caldwell by letter dated October 3, 2014. Id. at ¶ 31. That letter was substantively identical to the 2011 denial letter, stating only that "distribution of R. J. Reynolds tobacco products would not be improved by putting [Caldwell] on the Data Reporting Program." Id. At that time, Caldwell alleges that nothing was different about Caldwell's ability to distribute RJR products with benefit of the buydown as compared to the forty-five years in which RJR did honor Caldwell's invoices for buydowns. See id.

Further, Caldwell contends that part of the motivation for its second request to RJR was the pending acquisition of Lorillard, Inc. by RJR's parent company, Reynolds American, Inc. See id. at ¶ 32. Reynolds American, Inc.'s acquisition of Lorillard, Inc. was completed in June 2015. Id. at ¶ 33. Lorillard, Inc. was the manufacturer of Newport brand cigarettes and Newport is Caldwell's second best-selling brand of cigarettes, accounting for approximately fifteen percent (15%) of Caldwell's cigarette sales as of June 2015. See id. at ¶ 34. As a result of the Lorillard acquisition, Newport cigarettes, and all other Lorillard products, purchased from Caldwell were no longer eligible for buydowns as of June 2015. See id. at ¶ 35.

In the tobacco industry, for the sake of efficiency and convenience, retailer-customers prefer to purchase the products they sell to consumers from a single wholesaler or as few wholesalers as possible. See id. at ¶ 37. Therefore, RJR's refusal to buydown products sold by Caldwell forces many Caldwell customers to obtain RJR products from another wholesaler since they cannot feasibly forego buydowns at the expense of their profit margins. See id. at ¶ 38. By forcing Caldwell customers to use multiple wholesalers or suffer diminished profit margins, RJR has raised a substantial

impediment to Caldwell's ability to retain customers. See id. at ¶ 39. As a result of RJR's conduct, Caldwell alleges that it has lost the entire business of certain customers who have switched to another full-service wholesaler for all of their purchases. See id. at ¶ 40. But for the conduct of RJR, these customers would have remained with Caldwell. See id. at ¶ 41. Furthermore, Caldwell alleges that as a result of RJR's conduct, Caldwell has also lost a portion of the business of certain customers, who now purchase RJR products from other wholesalers. See id. at ¶ 42. But for the conduct of RJR, these customers would purchase RJR products from Caldwell. See id. at ¶ 43. Lastly, Caldwell contends that RJR's conduct has substantially impeded Caldwell's efforts to acquire new customers. See id. at ¶ 44. Customers that would have purchased some or all of their products from Caldwell but for the conduct of RJR have taken their business elsewhere to the substantial detriment of Caldwell. See id. at ¶ 45. These lost sales and business opportunities have continued to occur, on an ongoing basis, since December 2004, when RJR initially took Caldwell off direct and stopped buying down RJR products purchased from Caldwell, to the present, but have reached a point since the Lorillard acquisition that has caused Caldwell to conclude it cannot indefinitely sustain its business as the lost customers and lost business continue to increase. See id. at ¶ 46.

## II. LAW AND ANALYSIS

### A. Pleading Standards and the Rule 12(b)(6) Standard.

Rule 8(a)(2) of the Federal Rules of Civil Procedure governs the requirements for pleadings that state a claim for relief, requiring that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The standard for the adequacy of complaints under Rule 8(a)(2) is now a "plausibility" standard found in Bell

Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007), and its progeny. Under this standard, "factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555-556, 127 S. Ct. at 1965. If a pleading only contains "labels and conclusions" and "a formulaic recitation of the elements of a cause of action," the pleading does not meet the standards of Rule 8(a)(2). Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citation omitted).

Federal Rule of Civil Procedure 12(b)(6) allows parties to seek dismissal of a party's pleading for failure to state a claim upon which relief may be granted. In deciding a Rule 12(b)(6) motion to dismiss, a court generally "may not go outside the pleadings." Colle v. Brazos Cty., Tex., 981 F.2d 237, 243 (5th Cir. 1993). However, a court may also rely upon "documents incorporated into the complaint by reference and matters of which a court may take judicial notice" in deciding a motion to dismiss. Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008). Additionally, courts must accept all allegations in a complaint as true. See Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949. However, courts do not have to accept legal conclusions as facts. See id. Courts considering a motion to dismiss under Rule 12(b)(6) are only obligated to allow those complaints that are facially plausible under the Iqbal and Twombly standard to survive such a motion. See id. at 678-679, 129 S. Ct. at 1949. If the complaint does not meet this standard, it can be dismissed for failure to state a claim upon which relief can be granted. See id. Such a dismissal ends the case "at the point of minimum expenditure of time and money by the parties and the court." Twombly, 550 U.S. at 558, 127 S. Ct. at 1966.

Furthermore, a Rule 12(b)(6) motion to dismiss for failure to state a claim is the proper procedural device to raise a statute of limitations defense. See Bowers v. Nicholson, 271 F. App'x 446, 449 (5th Cir. 2008). A "motion to dismiss may be granted on the basis of prescription if the untimeliness appears from the face of the complaint." Potier v. JBS Liberty Sec., Inc., Civil Action No. 6:13-cv-00789, 2014 U.S. Dist. LEXIS 151271, at *6 (W.D. La. Sep. 29, 2014). If a "plaintiff's claims are prescribed on the face of the petition, plaintiff has the burden of proving the claims are not prescribed." Sims v. Am. Ins. Co., 2012-0204 (La. 10/16/12), 101 So. 3d 1, 4.

### B. LUTPA.

Caldwell's second claim is brought under LUTPA. See La. Rev. Stat. § 51:1409(A). Because there are multiple issues to decide as to Caldwell's LUTPA claim, the Court will analyze it first. In LUTPA, the legislature declared it to be unlawful to engage in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405. "Because of the broad sweep of this language, 'Louisiana courts determine what is a LUTPA violation on a case-by-case basis.'" Quality Envtl. Processes, Inc. v. I.P. Petroleum Co., Inc., 2013-1582 (La. 5/7/14), 144 So.3d 1011, 1025 (quoting Keith E. Andrews, Comment, Louisiana Unfair Trade Practices Act: Broad Language and Generous Remedies Supplemented by a Confusing Body of Case Law, 41 Loy. L. Rev. 759, 762 (1996)).

In order to prove a violation of LUTPA, Caldwell must show: "(1) an unfair or deceptive trade practice declared unlawful; (2) that impacts a consumer, business competitor or other person to whom the statute grants a private right of action; (3) which has caused ascertainable loss." Rockwell Automation, Inc . v. Montgomery, Civil Action

No. 17-415, 2017 U.S. Dist. LEXIS 80820, at *5-6 (W.D. La. May 24, 2017) (citation omitted). This court has consistently held that in establishing a LUTPA claim, a plaintiff must show that "the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious." Cheramie Services, Inc. v. Shell Deepwater Prod., 09–1633 (La. 4/23/10), 35 So.3d 1053, 1059. Consequently, "the range of prohibited practices under LUTPA is extremely narrow," as LUTPA prohibits only fraud, misrepresentation, and similar conduct, and not mere negligence. 35 So.3d at 1059. Moreover, conduct that offends established public policy and is unethical is not necessarily a violation under LUTPA. See, e.g., 35 So.3d at 1060 ("[O]nly egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA.").

RJR argues that Caldwell lacks standing because admittedly Caldwell is not a direct consumer or business competitor of RJR, Caldwell's action is time-barred, and Caldwell has failed to allege facts that would entitled it to relief. The Court will first address whether Caldwell has standing to assert a LUTPA claim.

### i. Standing.

RJR argues that a private right of action under LUTPA is limited to direct consumers or to business competitors of the defendant. Therefore, RJR contends that because Caldwell is neither a direct consumer nor a business competitor of RJR, Caldwell lacks standing to assert a LUTPA claim. To support this argument, RJR cites to a case decided by this Court. See Baba Lodging, LLC v. Wyndham Worldwide Operations, Inc., Civil Action No. 10-1750, 2012 U.S. Dist. LEXIS 36891, at *1 (W.D. La. Mar. 19, 2012). In Baba, one of the issues before the Court was whether LUTPA provided a private right

of action to plaintiffs other than direct consumers and business competitors. See id. The plaintiff argued that the Louisiana Supreme Court, in Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc., 2009-1633 (La. 4/23/10), 35 So.3d 1053, expanded LUTPA to allow any person to bring a claim, not just direct consumers or business competitors. See id. at *9. In Cheramie, the Louisiana Supreme Court noted that the LUTPA statute states that *"[a]ny person* who suffers any ascertainable loss . . . as a result of the use or employment by another person of an [unlawful] unfair or deceptive method, act, or practice . . . may bring an action." La. Rev. Stat. § 51:1409 (emphasis added); see 35 So.3d at 1056. Thus, the court in Cheramie rejected any holding that limited standing to only direct consumers and business competitors clarifying that the statutory language allows anyone harmed by prohibited unfair or deceptive practices to file a private right of action. See id. 1058.

However, this Court correctly noted that Cheramie was non-binding precedent because the portion of the opinion addressing LUTPA had only three out of the seven justices in agreement. Baba, 2012 U.S. Dist. LEXIS 36891, at *10. Thus, Cheramie did not represent a holding by the majority of the Louisiana Supreme Court. Rather, it is only a plurality, which does not have a binding effect on Louisiana state courts or this Court. See id. at *10. Accordingly, the Court held that in the absence of a majority opinion of the Louisiana Supreme Court definitively interpreting standing under LUTPA, the Court followed the binding Fifth Circuit holding in Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp., 292 F.3d 471, 480 (5th Cir. 2002), and dismissed the plaintiff's claims under LUTPA for lack of standing. Id. at *11.

In the present action, the Court agrees that it is not required to follow Cheramie. However, the Court now finds that its previous decision based on pre-Cheramie Fifth Circuit precedent regarding standing ignored the "bedrock principles of Erie v. Tompkins, 304 U.S. 64, 58 S. Ct. 817 (1938), which require a federal court sitting in diversity to apply the law of the state as declared by its legislature or the state's highest court." Burgers v. Bickford, Civil Action No. 12-2009, 2014 U.S. Dist. LEXIS 117323, at *7 (E.D. La. Aug. 22, 2014). "Thus, for a federal court the proper inquiry is not whether Cheramie is controlling authority in light of its plurality status but rather how the decision factors into the Erie 'guess' that this Court must make when applying state law. In the realm of Erie, Cheramie is not irrelevant even if the state's lower courts would consider it non-binding." Id. at *7.

Caldwell correctly points out that following Cheramie, Louisiana appellate courts, and a number of federal district courts, have followed the plurality opinion and found that private parties have a right of action under the LUTPA. See Jones v. Americas Ins. Co., 2016-0904 (La. Ct. App. 1st Cir. 8/16/17), 226 So.3d 537, 544; Bogues v. Louisiana Energy Consultants, Inc., 46-434 (La. Ct. App. 2nd Cir. 8/10/11), 71 So.3d 1128, 1132; J. A. Davis Properties, LLC v. Martin Operating P'ship, LP, 2017-449 (La. Ct. App. 3rd Cir. 6/21/17), 224 So.3d 39, 43; Prime Ins. Co. v. Imperial Fire & Cas. Ins. Co., 2014-0323 (La. Ct. App. 4th Cir. 10/1/14), 151 So.3d 670, 678; Hurricane Fence Co., Inc. v. Jensen Metal Products, Inc., 12-956 (La. Ct. App. 5th Cir. 5/23/13), 119 So.3d 683, 688; Rockwell Automation, Inc. v. Montgomery, Civil Action No. 17-415, 2017 U.S. Dist. LEXIS 80820, at *7 (W.D. La. May 24, 2017); Swoboda v. Manders, Civil Action No. 14-19-EWD, 2016 U.S. Dist. LEXIS 53377, at *18 (M.D. La. Apr. 21, 2016); Max Access, Inc. v. Gee Cee

Co. of LA, Civil Action No. 15-1728, 2016 U.S. Dist. LEXIS 14166, at *13 (E.D. La. Feb. 5, 2016). Accordingly, while Cheramie may not be binding upon this Court, it is instructive to the issue of standing. In light of Cheramie, as well as the decisions of Louisiana appellate courts and the federal district courts decisions following same, the Court finds that Caldwell has standing to assert a claim under the LUTPA.

### ii. Peremption.

A one-year limitations period applies to private actions brought under LUTPA. See La. Rev Stat. § 51:1409(E) (private action under LUTPA "shall be prescribed by one year running from the time of the . . . act which gave rise to th[e] right of action"). However, the Louisiana Supreme Court has not yet ruled as to whether La. Rev. Stat. § 51:1409(E) implicates peremption or prescription. Nonetheless, a court within this district as well as other federal district courts and state appellate courts have determined that the time for filing a private cause of action under LUTPA is peremptive in nature rather than prescriptive. See Jones v. Herlin, Civil Action No. 12-1978, 2013 U.S. Dist. LEXIS 133037, at *23 (W.D. La. Sep. 17, 2013); Max Access, Inc. v. Gee Cee Co. of LA, Civil Action No. 15-1728, 2016 U.S. Dist. LEXIS 14166, at *16 (E.D. La. Feb. 5, 2016); Morris v. Sears, Roebuck & Co., 99-2772 (La. Ct. App. 4th Cir. 05/31/00), 765 So. 2d 419, 422. Therefore, this Court holds that the limitation period for LUTPA claims is peremptive. Throughout Louisiana courts, peremption means that a claim cannot be suspended or interrupted. See Glod v. Baker, 2004-1483 (La. Ct. App. 3rd Cir. 3/23/05), 899 So. 2d 642, 649, writ denied, 2005-1574 (La. 1/13/06), 920 So. 2d 238 ("[T]he third circuit has made a jurisprudential commitment to a strict definition of peremption embodied in the Civil Code and manifested in its consistent decisions barring use of the continuing

violation doctrine to suspend peremption."). However, the Fifth Circuit has found that there are certain situations where the presence of a continuing violation of LUTPA extends the time period a party can bring a claim under LUTPA, i.e., a claim under LUTPA can be suspended. See Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp., 292 F.3d 471, 482 (5th Cir. 2002). The Court need not address whether the continuing tort doctrine applies to suspend the running of peremption because the Court finds that the continuing tort doctrine does not apply in the present case as discussed *infra*.

In the present action, RJR argues that the "act" at issue here is RJR's alleged termination of Caldwell's status as a direct purchaser in December 2004. See Record Document 17-1 at 10, RJR's Memorandum in Support of Motion to Dismiss. As Caldwell did not file this action until January 2017, RJR contends Caldwell's claim is too late and thus must be dismissed. See id. Caldwell argues that RJR's "continuing" and "ongoing" decision to deny buydown reimbursement payments while providing them to competing wholesalers, who lack a direct purchasing relationship with RJR, is the operating cause that injures Caldwell rather than RJR's decision in 2004 to terminate Caldwell's status as a direct purchaser. See Record Document 21 at 6, Caldwell's Memorandum in Opposition to RJR's Motion to Dismiss (emphasis added). By pleading that RJR's decision was "continuing" and "ongoing," Caldwell has invoked the continuing tort doctrine in an attempt to prevent its claims from being time-barred.

"[A] continuing tort [is] one 'where the operating cause of injury is a continuous one and gives rise to successive damages.'" Miller v. Conagra, Inc., 2008-0021 (La. 9/8/08), 991 So.2d 445, 456 (citation omitted). In other words, "the continuing tort doctrine only applies when continuous conduct causes continuing damages." Risin v. D.N.C.

Investments, L.L.C., 2005-0415 (La. Ct. App. 4th Cir. 12/7/05), 921 So.2d 133, 136. "When . . . damaging conduct continues, prescription runs from the date of the last harmful act." S. Cent. Bell Tel. Co. v. Texaco, Inc., 418 So.2d 531, 532 (La.1982).

In the present action, the Court finds that RJR's alleged conduct was not continuous. Rather, RJR's actions, without determining whether Caldwell pleaded sufficient facts to establish a LUTPA violation, were separate actions entitled to their own respective time periods. The specific conduct alleged in the complaint was when RJR terminated the direct purchaser contract in 2004, rejected Caldwell's request for buydown status in 2011, and again in 2014. Caldwell requests this Court to consider the time period between 2004 to present in order to survive the present Motion to Dismiss where RJR refused to issue buydown payments. By pleading that RJR's decision was a "continuing" and "ongoing" decision to deny buydown reimbursement payments while providing them to competing wholesalers, who lack a direct purchasing relationship with RJR, Caldwell argues that this "ongoing" and "continuing" decision was the operating cause that injured Caldwell. However, the Court is not persuaded by Caldwell's argument that the continuing tort doctrine applies to the present case. Caldwell has only pleaded certain, separate events, separated by several years, where RJR directly refused to provide buydown reimbursement payments to Caldwell. The October 3, 2014 refusal is significant in that Caldwell pleads no other communication or action between the respective parties after that date. Accordingly, the Court finds the decision by RJR on October 3, 2014 was a separate act that triggered the running of the peremptive period. The fact that Caldwell continued to suffer ill effects because of the October 3, 2014 decision does not bring the continuing tort doctrine into play. Furthermore, the acquisition of Lorillard in 2015 has no

effect of the Court's decision and even if it did, this transaction was completed over a year before Caldwell initiated the present action. This lawsuit was filed on January 1, 2017, more than one year from RJR rejecting Caldwell's second request. Additionally, Caldwell has failed to meet its burden of showing that its LUTPA claim is not perempted because Caldwell's Complaint not only is lacking continuous factual allegations of LUTPA violations, but Caldwell also fails to cite any case law that supports its assertion that its LUTPA claim is not perempted. Sims v. Am. Ins. Co., 2012-0204 (La. 10/16/12), 101 So. 3d 1, 4 (If a "plaintiff's claims are prescribed on the face of the petition, plaintiff has the burden of proving the claims are not prescribed."). Accordingly, the Court finds that Caldwell's LUTPA claim is perempted, and the Court **GRANTS** RJR's Motion to Dismiss with respect to this claim.

Because the Court decided Caldwell's LUTPA claim on peremption grounds, the Court need not address the merits of Caldwell's LUTPA claim.

### C. Tortious Interference with Business Relations.

"Louisiana courts . . . recognize[ ] a cause of action for tortious interference with business relations." Bogues v. Louisiana Energy Consultants, Inc., 46-434 (La. Ct. App. 2nd Cir. 8/10/11), 71 So.3d 1128, 1134 (citations omitted). Nonetheless, Louisiana courts view this cause of action with disfavor. Mt. States Pipe & Supply Co. v. City of New Rds., Civil Action No. 12-2146, 2013 U.S. Dist. LEXIS 87446, at *7-8 (E.D. La. June 21, 2013) ("Louisiana jurisprudence . . . has viewed this cause of action with disfavor."). The cause of action for tortious interference with business is derived from La. Civ. Code art. 2315 and is based on the principle that the right to influence someone not to enter into business transactions with others is not absolute. See id. at 1134 (citations omitted). In Louisiana,

business operators are protected from "malicious and wanton interference." See id. However, Louisiana law permits interference designed to protect legitimate interests of the actor. See id. "A plaintiff bringing a claim for tortious interference with business must ultimately show 'by a preponderance of the evidence that the defendant improperly influenced others not to deal with the plaintiff.'" Id. at 1135 (citation omitted). "Significantly, it is not enough to allege that a defendant's actions affected plaintiff's business interests; the plaintiff must allege that the defendant actually prevented the plaintiff from dealing with a third party." Id. at 1135.

Because a cause of action for tortious interference with business is delictual, the applicable prescriptive period is one year. See La. Civ. Code art. 3492 ("Delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained."). The Court adopts the analysis as to Caldwell's LUTPA claim for Caldwell's tortious interference claim. Based on the Court's analysis *supra*, Caldwell's tortious interference with business claim is also time-barred. Accordingly, the Court **GRANTS** RJR's Motion to Dismiss with respect to this claim.

### III. CONCLUSION

Based on the foregoing analysis, the Court holds that Caldwell's LUTPA claim is perempted and Caldwell's tortious interference with business claim is prescribed on the face of the pleadings. Accordingly,

**IT IS ORDERED** that the Motion to Dismiss (Record Document 17) filed by RJR be and is hereby **GRANTED,** and all claims against RJR are **DISMISSED WITH PREJUDICE**.

A Judgment consistent with the terms of the instant Memorandum Riling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, on this 11th day of May, 2018.

_____
S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT